**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| Michael Beeler, as administrator of the Estate of Deborah Beeler, deceased, | ) ) ) |
| Plaintiff, | ) Case No: 11-CV-492-PJC ) ) |
| vs. | ) ) |
| BNSF Railway Company, Defendant. | ) ) ) |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Michael Beeler, as Administrator of the Estate of Deborah Beeler, deceased, by his attorneys, James L. Farina and Hoey and Farina, P.C., hereby moves for a summary judgment that (1) BNSF Railway Company is liable, pursuant to § 51 of the Federal Employers Liability Act (45 U.S.C. § 51), for the accident that killed Deborah Beeler; and (2) the defense of contributory negligence does not apply—pursuant to §§ 53 and 54a of the Act—because the railroad's violation of a federal regulation "contributed to the . . . death of such employee." (45 U.S.C. § 53.) In support of this motion, Plaintiff relies on the following grounds:

1.  Plaintiff is suing under the Federal Employers Liability Act, 45 U.S.C. sec. 51, *et seq*. (FELA), for damages resulting from the death of Deborah Beeler on August 4, 2011, while she was employed as a railroad freight conductor for BNSF Railway Company (BNSF). At approximately 1:50 a.m. on August 4, 2011, Deborah Beeler was a passenger in a Kubota utility vehicle operated by her co-employee, Randy Battenfield, at the defendant's Cherokee Railroad Yard in Tulsa, Oklahoma. (Exhibit B, Affidavit of Randy Battenfield ¶ 6.)

2.  Cherokee Yard is what is referred to as a "hump yard." In a hump yard, a locomotive pushes individual freight cars, or a string of cars, over the top of a hill, or hump, and

gravity sends the cars silently rolling down tracks, through a series of switches that are aligned to send the cars down various sets of tracks so they can be assembled into trains of cars that are going to the same destination. http://en.wikipedia.org/wiki/Classification_yard#Hump_yards (visited on August 17, 2013). Because of the deadly dangers presented by silently rolling freight cars, compliance with safety regulations is of utmost importance in hump yards.

3. As the Kubota proceeded through the Crest Tower Crossing on August 4, 2011, at approximately 1:50 a.m., a silently rolling flatcar struck the vehicle and Deborah Beeler, resulting in her death. (Exhibit A, BNSF's Answer to Plaintiff's Request to Admit Facts ¶ 1.)

4. Section 51 of the FELA provides an action for damages against railroads engaged in interstate or foreign commerce for the injury or death of an employee "resulting in whole **or in part** from the negligence of any of the officers, agents or employees of such carrier[.]" 45 U.S.C. § 51 (emphasis added). And under the FELA, railroads are strictly liable for the injury or death of a railroad employee caused "in whole or in part" by the violation of any federal safety regulation. *Walden v. Illinois Central,* 975 F.2d 361, 364 (7th Cir. 1992); *Martinez v. Burlington Northern & Santa Fe Ry. Co.*, 276 F. Supp. 2d 920 (N.D. Ill., 2003).

5. Section 53 of the FELA provides in part that "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee[.]" 45 USC § 53. However, § 53 of the FELA further provides that when a railroad's violation of a statute or regulation enacted for the safety of employees contributes to the injury or death, the employee cannot be deemed guilty of any contributory negligence. 45 USC § 53 ("Provided, That no such employee who may be injured or killed shall be held to have been

guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."); 45 USC § 54a ("A regulation, standard, or requirement in force, or prescribed by the Secretary of Transportation under chapter 201 of title 49 or by a State agency that is participating in investigative and surveillance activities under section 20105 of title 49, is deemed to be a statute under sections 53 and 54 of this title.").

6. On and prior to August 4, 2011, BNSF had in effect certain railroad "special instructions" contained in its General Notice No. 1090, including "Item 14," which states:

> Item 14: Permission to Use Road Crossings During Humping Operations
>
> **During humping operations, verbal permission must be obtained from either the Crest Tower Yardmaster or the Star One Operator before using any road crossing over tracks connected to humping operations. This restriction includes service crossings for Mule, ATV or other similar service-type vehicles. Humping operations must be stopped before permission can be granted to occupy such crossings.**

(Exhibit G; General Notice No. 1090, Item 14 (emphasis added.)

7. There is no dispute that Randy Battenfield violated Item 14 on August 4, 2011, when he failed to obtain permission before proceeding through the Crest Tower Crossing. (Exhibit B, Battenfield Affidavit ¶¶ 6–7; Exhibit F, BNSF's Second Supplemental Answers to Battenfield's Interrogatories ¶ 1(a); Exhibit O, DeVault Deposition, Part II, pp. 9, 42–43.)

8. If Battenfield had complied with Item 14 by radioing to the yardmaster to request permission to drive through the Crest Tower Crossing on August 4, 2011, then the yardmaster would have halted "humping operations" before permission was granted, and Deborah Beeler would not have been killed by the flatcar that silently rolled down the tracks in the darkness. Thus, there can be no legitimate dispute that Battenfield's failure to comply with Item 14 was a cause, at least in part, of the collision between the Kubota and the flatcar that killed Beeler.

9. A federal railroad safety regulation, 49 C.F.R. § 217.9, requires all railroads to perform periodic operational tests and inspections to determine the extent of compliance with its written rules. Specifically, this federal railroad safety regulation provides:

> 217.9  Program of operational tests and inspections; recordkeeping.
>
> (a) Requirement to conduct operational tests and inspections. **Each railroad to which this part applies shall periodically conduct operational tests and inspections to determine the extent of compliance with its code of operating rules, timetables, timetable special instructions in accordance with a written program retained at its system headquarters and at the division headquarters for each division where the tests are conducted.**

(49 C.F.R. § 217.9 (emphasis added).)

10. In accordance with the regulatory requirement for the creation of a written program of operational tests and inspections to determine the extent of compliance with its rules, BNSF Railway issued its "Operations Testing Reference Guide," which states: "The BNSF

Railway Operations Testing Program is **designed to comply with CFR 217.9**." (Exhibit G, pg. 5, emphasis added.) Leaving absolutely no doubt as to the purpose of the BNSF's operations testing program, the introduction states:

> Operations testing is mandated by the BNSF company policy. **BNSF requires operational tests and inspections to determine the extent of compliance with rules, policies, instructions and general procedures** specific to an employee skill set. Operations testing provide BNSF employees with the opportunity to demonstrate their ability to apply the rules and instructions in the work environment. **Conducting quality operations testing communicates clearly to employees what is expected of them**. By reviewing particular rule and instruction requirements in a field inspection, both the employee and supervising can gauge the level of rules proficiency.
>
> The testing supervisor should use this process **to verify that employees are working safely in compliance with all company rules, policies, instructions and procedures**. When expectations are not being met, **this process allows for correction of operating deficiencies before those same deficiencies become incidents.**

(*Id.*, emphasis added.)

11.     Despite the fact that BNSF's compliance manual—which says it was "designed to comply with CFR 217.9"—mandated operations testing on "**all company rules, policies, instructions and procedures**," there is no dispute that BNSF **never** conducted any operations

5

testing to determine whether its employees were complying with Item 14, which required employees to obtain permission from the Crest Tower Yardmaster before driving through the Crest Tower Crossing in Cherokee Yard. (Exhibit H, BNSF's Response to Plaintiff's Second Request to Admit Facts ¶ 1.)

12.   BNSF has also admitted that it never disciplined any of its employees for violating Item 14. (*Id*. ¶ 3.) By failing to discipline employees for violating Item 14—and by failing to conduct the operations testing that was required by 49 C.F.R. 217.9 to determine the extent of compliance with this safety regulation—BNSF created an environment where the safety requirements imposed by Item 14 were regularly ignored with impunity.

13.   BNSF's failure to conduct any operational testing to determine compliance with the special instructions in Item 14 led to a widespread understanding among the BNSF's employees at Cherokee Yard that it was not necessary to call for permission from the yardmaster before driving through the Crest Tower Crossing. Consequently, it became the normal practice at the yard to ignore Item 14. The pervasive practice of disobeying Item 14, and the general knowledge of employees at Cherokee Yard that BNSF did not enforce Item 14 is borne out by the testimony of Defendant's own employees. Specifically,

(a) Richard Steeples, Crest Tower Yardmaster, retired from BNSF on July 13, 2012, after working for 42 years and four months at the Cherokee Yard. (Exhibit J, Steeples Deposition pp. 8–11.) As the Crest Tower Yardmaster, Steeples would have been informed if an employee called for permission to drive through a crossing at Cherokee Yard. (*Id.* pp. 25–26.) However, Mr. Steeples testified that in the 42 years he worked for the railroad at Cherokee Yard, Item 14

"has never been enforced." (*Id*.) And prior to August 4, 2011, no BNSF supervisor or manager had asked Mr. Steeples if employees were complying with Item 14 when driving through the crossing at the base of the master retarder. (*Id*. pg. 29.) [A retarder is a device used to reduce the speed of freight cars as they roll through a hump yard. See wikipedia.org/wiki/Retarder (railroad) (visited on August 17, 2013). The crossing at the base of the master retarder in Cherokee Yard is also referred to as the Crest Tower Crossing or the "hump crossing."] At the safety meetings he attended at Cherokee Yard, no management official ever mentioned the need for complying with Item 14. (Steeples Deposition pp. 29–30.) Yardmaster Steeples also testified that on a typical daytime shift, two dozen or more vehicles would typically drive through the "hump crossing," but there would usually be only one call to the Crest Tower for permission to cross. Despite that roughly 96% rate of violating Item 14, Steeples is not aware of anyone ever being reprimanded or otherwise disciplined for disobeying that rule. (*Id*. pp. 28-29.)

(b) Steve McLaughlin has been a conductor/switchman for the BNSF since June 1, 1993. (Exhibit K, McLaughlin Deposition pg. 7.) McLaughlin, who worked at the Cherokee Yard since 2006 or 2007 (*id.* pg. 8), drove a Kubota utility vehicle through the crossing at the base of the hump about 15 times a shift—but he never asked for permission to drive through that crossing. (*Id.* pg. 17.) Over the years, McLaughlin also observed other BNSF employees driving through that crossing—but he never noticed any of those workers stopping and asking for permission from the Crest Tower Yardmaster before proceeding

7

through the crossing. (*Id.* pg. 18.) And McLaughlin was never told that he was violating any rule when drove through the crossing without first getting permission from Crest Tower. (*Id*. pp. 19-20.) When McLaughlin worked at Cherokee Yard prior to August 4, 2011, Item 14 was never enforced. (*Id*. pp. 18-21.)

(c) Matthew Pettus has been a yardmaster at Cherokee Yard for the last 13 years. (Exhibit L, Pettus Deposition pg. 7.) Over the years he has seen BNSF employees from "just about every craft [department] cross the hump [crossing] without permission," and that includes supervisors in the white Jeep-like vehicles that management personnel used. (*Id.* pp. 26–27.) BNSF never enforced the rule that required people to get permission before they drove through the crossing at the base of the master retarder. (*Id*. pg. 25.)

(d) Bruce Patrick, a BNSF conductor (Exhibit M, Patrick Deposition pp. 8–9), has personally observed BNSF employees, including management personnel, using the Crest Tower Crossing without first stopping and getting permission. (*Id*. pp. 19-20.)  During the time he worked at Cherokee Yard before August 4, 2011, Item 14 was never enforced. (*Id.*)

(e) Robert Bollinger is a freight conductor who has been employed by the BNSF since 2008. (Exhibit P, Bollinger Deposition pg. 7.)  During the time he worked at Cherokee Yard, Bollinger never saw other employees call the tower for permission to drive through the Crest Tower Crossing; and when he was a driver, he never called for permission to drive through the crossing. (*Id*. pp. 13–14.)

    Bollinger is not aware of anyone ever being reprimanded or disciplined for driving through the Crest Tower Crossing without permission. (*Id*.)

    (f) Michael Townsend is a trainmaster who worked at the Cherokee Yard most of his career. (Exhibit Q, Townsend Deposition pp. 7–8.) Despite being a management level employee for the BNSF, he admitted failing to ask for permission from the yardmaster roughly 30% of the time when he drove through the crossing at the base of the hump in Cherokee Yard. (*Id*. pp. 11–12.) Although each time he drove through the crossing without permission he was violating Item 14, he was never reprimanded or told he was doing anything wrong. (*Id*. pp. 15–16.) And he is not aware of anyone ever having been admonished to comply with, or given a warning or disciplined for violating, Item 14. (*Id.* pp. 15–17.) Prior to August 4, 2011, he had never heard anyone say—at any safety meeting, job briefing, or other gathering of BNSF employees—that Item 14 needed to be enforced. (*Id*. pg. 18.)

14.  BNSF violated 49 CFR 217.9 by failing to perform operational testing for compliance with the special instructions provided by Item 14; and the railroad's failure to perform operational testing for compliance with Item 14 resulted in a failure to communicate with its "employees as to what is expected of them." (Exhibit G, BNSF Railroad Operations Testing Guide pg. 5.) The safety rule requiring permission from the Crest Tower Yardmaster before driving through the crossing was flouted so regularly, openly and extensively that the standard de facto operating procedure at Cherokee Yard was to ignore this requirement. And the standard practice of ignoring this safety rule had become widespread and firmly established long

before Randy Battenfield started working at Cherokee Yard a few months before the accident that killed Deborah Beeler. Specifically:

(a) Battenfield was hired by BNSF on February 7, 2011, and worked at Cherokee Yard for only a few months before the deadly accident. (Exhibit B, Battenfield Affidavit ¶ 2.)

(b) While Battenfield worked at Cherokee Yard, BNSF never enforced Item 14, and the standard operating practice at the yard was to not ask for permission from Crest Tower before driving through the crossing. (*Id*. ¶ 3.)

(c) Battenfield personally observed BNSF managers and employees from the railroad's transportation and mechanical departments travel through the crossing without first obtaining permission. And when he asked other BNSF employees why no one complied with Item 14, **he was told that BNSF did not want to slow down operations.** (*Id*. ¶ 4.)

(d) During the entire time that Battenfield worked at Cherokee Yard, he never obtained permission from Crest Tower prior to driving through the Crest Tower Crossing. And having never being told anything to the contrary, he believed it was not necessary to comply with Item 14. (*Id*. ¶ 5.)

(e) Battenfield did not comply with the requirements of Item 14 on August 4, 2011, because it was not the actual operating procedure at Cherokee Yard. (*Id*. ¶ 7.)

15.   Plaintiff retained George A. Gavalla, former head of the Federal Railroad Administration's Office of Safety (Exhibit R; Gavalla Affidavit ¶ 3) to conduct an investigation into the circumstances leading to the death of Deborah Beeler. It was part

of Gavalla's duties to direct system-wide assessments of the operational testing of each Class 1 railroad, including the BNSF. (*Id.*) Gavalla has concluded that:

(a) BNSF's Operational Testing program provided for operational tests and inspections involving the rules contained in its operating rules manual, safety rules, special instructions and general notices. (*Id.* ¶10).

(b) The special instructions contained in Item 14 of BNSF's General Notice 1090 are the type of special instructions that railroads are expected to monitor through their operational testing and inspection programs, pursuant to 49 CFR §217.9. (*Id.* ¶11.)

16. An important difference between the FELA and common law negligence cases is the degree of proof required to establish causation. *CSX Transportation, Inc. v. McBride,* 131 S. Ct. 2630 (2011). In *McBride*, the U.S. Supreme Court recently affirmed the well-established principle that a railroad employer is **strictly liable** for the injury or death of a railroad employee if the violation of a federal safety regulation "played any part, **even the slightest**, in producing the injury." *CSX Transportation, Inc. v. McBride*, 131 S. Ct. 2630, 2634 (2011) (emphasis added).

17. Defendant's own words, contained in the "BNSF Railway Operations Testing Reference Guide," have now come back to haunt it: Operations testing was crucial because, "when expectations are not being met, this process **allows for correction of operating deficiencies before those same deficiencies become incidents**." (Exhibit G pg. 5, emphasis added). There is overwhelming and compelling evidence that BNSF's admitted failure to conduct operational testing on compliance with Item 14—which violated 49 C.F.R. § 217.9—allowed the flagrant "operating deficiencies" at the Crest Tower Crossing that caused Deborah Beeler's death.

18.     Dozens of times a day, BNSF employees would drive through the Crest Tower Crossing without first obtaining permission from the yardmaster. Yet BNSF ignored those widespread violations of Item 14 so that its operations would not be slowed by compliance with this safety requirement. Because of BNSF's persistent pattern of violating 49 C.F.R. § 217.9 and ignoring Item 14, it became the de facto operating procedure at Cherokee Yard to disregard the safety requirements of Item 14. And because of BNSF's persistent pattern of violating 49 C.F.R. § 217.9 and ignoring Item 14, Randy Battenfield failed to call for permission to drive through the Crest Tower Crossing on August 4, 2011, resulting in the accident that killed Deborah Beeler..

19.     If BNSF had complied with 49 C.F.R. § 217.9, Battenfield would have called for permission to drive through the crossing, and permission would have been withheld until the deadly flatcar had passed.  No reasonable jury could fail to find that BNSF's violation of 49 CFR 217.9—in its failure to test for and ensure compliance with Item 14—played a part, even if slight, in the accident that killed Deborah Beeler. And under the controlling FELA standards, a railroad is strictly liable for the injury or death of its employee if the violation of a federal safety regulation "played any part, **even the slightest**, in producing the injury." *CSX Transportation, Inc. v. McBride*, 131 S. Ct. 2630, 2634 (2011) (emphasis added).

20.     Under these circumstances, Plaintiff is entitled to a summary judgment that (1) BNSF is liable, pursuant to § 51 of FELA, for the accident that killed Deborah Beeler; and (2) the defense of contributory negligence does not apply—pursuant to §§ 53 and 54a of FELA—because the railroad's violation of a federal regulation "contributed to the . . . death of such employee." (45 U.S.C. §§ 53 and 54a.)

Wherefore, Plaintiff Michael Beeler, as Administrator of the Estate of Deborah Beeler, Deceased, prays for partial summary judgment that (1) BNSF is liable for the accident that killed Deborah Beeler; and (2) the defense of contributory negligence does not apply.

        Respectfully submitted,
        Michael Beeler, Plaintiff

By:  s/James L. Farina
       Hoey & Farina

       542 South Dearborn Street
       Suite 200
       Chicago, IL 60605
       (312) 939-1212
       jlfarina@hoeyfarina.com